## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02589-REB-KLM

MICHAEL BACOTE,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,
G. SANDUSKY, Correctional Officer, and
A. BALSICK, Correctional Officer,

      Defendants.

---

## FOURTH AMENDED COMPLAINT

---

Plaintiff Michael Bacote, respectfully complains as follows against Defendants Federal Bureau of Prisons, G. Sandusky, and A. Balsick.

## I.      NATURE OF THE ACTION

1.      This lawsuit concerns the Federal Bureau of Prisons ("BOP") and BOP staff's treatment and housing of Michael Bacote, a seriously mentally ill prisoner housed at the United States Penitentiary Administrative Maximum facility located in Florence, Colorado ("ADX").

2.      Bacote seeks declaratory and injunctive relief requiring the BOP to comply with the constitutional requirements of the Eighth Amendment in its diagnoses, treatment, and housing of him.  He also seeks declaratory and injunctive relief requiring the BOP to comply with its own policies regarding his placement and treatment given his serious mental illness.

3.     Bacote further seeks monetary damages for Defendants Sandusky and Balsick's retaliation against him for his lawful participation in activity protected by the First Amendment.

4.     This lawsuit seeks to remedy the deficient mental health system at ADX by means  of a permanent injunction, consistent with the requirements of the Prison Litigation Reform Act  ("PLRA"), 18 U.S.C. § 3626, requiring the BOP to honor its own policies and the constitutional  rights of ADX prisoners by providing mental health diagnostic and treatment services.

## II.     JURISDICTION

5.     This Court's subject matter jurisdiction over the allegations in this Fourth Amended Complaint is based on 28 U.S.C. § 1331, in that the claims for injunctive relief arise  under the United States Constitution and federal statutes.  The request for declaratory relief is  based upon 28 U.S.C. § 2201, in that an actual controversy exists between Defendants and Bacote over the continual denial of services and treatment that are guaranteed by the United States Constitution.

## III.     VENUE

6.     Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b), because a  substantial part of the acts or omissions that give rise to Bacote's claims occurred or will occur  in the District of Colorado.

## IV.     PARTIES

7.     Plaintiff Michael Bacote is currently housed at ADX.  He suffers from various serious mental illnesses, including Bipolar Disorder, Type I, Depressive Episode

127899313.6

with mixed features and persecutory delusions and Major Depressive Disorder.  He has also been diagnosed with Mild Mental Retardation (or a Neurodevelopmental Disorder of Mild Intellectual Disability), is functionally illiterate, and suffers the long-term effects of a serious closed head injury.  Bacote was originally a named plaintiff in Civil Action No. 12-cv-01570-RPM in the United States District Court for the District of Colorado (the "Cunningham Lawsuit").[1]

8.      Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice, and is responsible for the administration of federal prisons, including ADX.  The BOP maintains physical custody of Bacote, and is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries.

9.      Defendant G. Sandusky is a correctional officer who works, or used to work, at ADX.  He is sued herein in his individual capacity.

10.     Defendant A. Balsik is a correctional officer who works, or used to work, at ADX.  He is sued herein in his individual capacity.

## V.      GENERAL ALLEGATIONS

### A.      Background and Operation of ADX

11.     ADX is the most secure federal penitentiary in the United States.  Staff at ADX often refer to it as the "Alcatraz of the Rockies."   ADX was built to house prisoners whom the BOP believes present the greatest threats to the  correctional staff or to other

---

[1] The Cunningham Lawsuit has received significant media attention.  *See, e.g.* "Inside America's Toughest Federal Prison," The New York Times, March 29, 2015, accessible at: http://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html?_r=0.

127899313.6

prisoners.  Prisoners spend at least 20 and as many as 24 hours per day locked alone in isolated cells, and are subject to a harsh and unforgiving disciplinary regimen.  Such isolation and brutal discipline are inappropriate for prisoners who have mental illness.

12.    At any given time, between 400 and 500 prisoners are housed at ADX in nine  different maximum-security housing units, which are divided into six security levels: the Control  Unit (or "Bravo" Unit); the disciplinary Special Housing Unit (also called "Charlie" Unit, "Zulu"  Unit, the "SHU," or the "Hole"); so-called "Range 13," an ultra secure and isolated four-cell  wing of Charlie Unit in which the BOP houses prisoners it thinks require confinement with  virtually no human contact; four so-called "General Population" Units ("Delta," "Echo," "Fox,"  and "Golf" Units), the Special Security Unit (also called the "SAMs" Unit or "Hotel" Unit); and  two units ("Joker" Unit and "Kilo" Unit) that in recent years have been used as transitional  housing units for prisoners who have entered the so-called "Step-Down Program," in which such prisoners can earn their way out of ADX and into a lower security classification.  At some point one side of Joker Unit was  converted into an extension of ADX's Special Security Unit for prisoners under Special  Administrative Measures ("SAMs").  Upon information and belief, only one side of  Joker Unit, comprising 32 cells, houses prisoners in the first stage of the Step-Down Program.

13.    Depending on which unit they are housed in, prisoners at ADX spend at least 20, and as much as  24, hours per day locked alone in their cells.  The cells measure approximately 12 feet by 7 feet,  and have solid walls that prevent prisoners from viewing the interiors of other cells or having  direct contact with prisoners in

adjacent cells.  All ADX cells have solid doors with a small  closable slot.  Cells in all units other than Hotel, Joker, and Kilo Units also have an interior barred  wall with a sliding door, which together with the exterior door forms a sally port in each cell.

14.     Each cell is furnished with a concrete bed, desk, and stool, and a stainless steel combination sink  and toilet.  Cells in all units other than Hotel, Joker, and Kilo Units include a shower with an  automatic shut-off valve.  The beds are usually dressed with a thin mattress and blankets over the  concrete.  Each cell contains a single window, approximately 42 inches tall and four inches wide,  which allows entry of some natural light but which is designed to ensure that prisoners cannot  see anything outside of their cells other than the building and sky.  Many cells, except those in the  SHU, are equipped with a radio and black and white television that offers religious and educational programming, along with some general interest and recreational programming.

15.     Televisions often are withheld from prisoners as punishment.  Meals are delivered three times a  day.  With few exceptions, prisoners in most ADX units are allowed out of their cells only for  limited social or legal visits, some forms of medical treatment, visits to the "law library"  (essentially a cell with a specialized computer terminal that provides access to a limited range of federal legal materials), and a few hours a week of indoor or outdoor recreation.  Otherwise they remain locked in their cells at all times.

16.     The Control Unit is among the most secure and isolated units currently in use at  ADX.  Prisoners in the Control Unit are isolated from other prisoners at all times,

even during  recreation, for extended terms often lasting six years or more.  Their only meaningful contact  with other humans is with ADX staff members.  The compliance of Control Unit prisoners with  institutional rules is assessed monthly; a prisoner is given "credit" for serving a month of his  Control Unit time only if he maintains clear conduct for the entire month.  Given their complete lack of access to mental health care, prisoners with serious mental illness confined in the Control Unit frequently have behavioral  issues caused by their mental illness.  Such conduct often results in the loss of credit for Control  Unit time served, thus indefinitely extending the prisoner's time in the extreme isolation of the Control Unit,  sometimes for years.

17.      Prisoners confined to the SHU live in similar isolation.  They are continuously  segregated from other prisoners, even during recreation.  Unlike other ADX prisoners, those in the SHU are frequently denied access to televisions and radios, and sometimes are confined with  nothing in their cells but a mattress and minimal clothing (for example, a t-shirt and boxer  shorts).  ADX prisoners are housed in the SHU in several circumstances.  Most ADX prisoners  spend at least a few days in the SHU upon their arrival at the institution.  Others are moved to the  SHU pending investigation of incidents such as fights that occur from time to time elsewhere in  the institution.  Prisoners who receive disciplinary incident reports (or "shots" in the ADX vernacular), and who, as a result, are sentenced to a term of punitive segregation, serve that time  in the SHU.  Like Control Unit prisoners, many prisoners confined to the SHU are serving a  specified term of disciplinary detention, but that time may be extended by further shots.

18.     As in the Control Unit, prisoners with mental illness held in the extreme isolation and sensory deprivation of the SHU frequently receive additional shots due to behavioral incidents resulting from their mental illness.  As a result, many prisoners with serious mental illness have lived in the ADX SHU for many months, and some have lived there for years.

19.     In the four "General Population" units, prisoners also are isolated from one another, spending at least 22 hours per day alone in their cells.

20.     One or two days a week "General Population" inmates are allowed outside recreation time, during which they may be able to see and speak with a limited number of other prisoners while all are confined in separate outdoor cages.  One or two days a week, prisoners in most ADX units also have a few hours of access, one at a time, to individual indoor recreation rooms.

21.     The ADX Step-Down Program is a series of three transitional housing units in which prisoners are afforded direct, although still extremely limited, contact with other prisoners.  The step-down units represent a type of halfway house on the path to being allowed to leave ADX for another prison.  Still, prisoners who reside in the step-down units are confined to their cells for all but a few hours a day.  Because of the erratic way that the ADX Step-Down Program operates, the step-down units are particularly dangerous for prisoners with mental illnesses who are trying to "earn" their way to a lower security classification.

22.     Every prisoner intent on earning his way out of ADX is required to pass through Joker Unit, one side of which, comprising 32 cells, houses the first stage in the

127899313.6

Step-Down Program.  Prisoners are eligible for transfer to Joker Unit only after completing an extended period of clear conduct.  Prisoners who avoid trouble in Joker Unit are eligible to move, after a time, to the second phase of step-down, where they have more freedom.  The second phase is housed at USP Florence, which lies directly across the street from ADX.  Prisoners who successfully complete the second step-down phase are eligible to move to the final step-down phase (also housed at USP Florence), which provides even more freedom and a pathway to a transfer to a regular maximum security federal penitentiary.  Successful completion of the Step-Down Program can take years, even if a prisoner behaves perfectly.  But any transgression, however minor, can and often does result in the prisoner's removal from the program, placement back in the ADX SHU, and a restarting of the good-conduct clock.  Many ADX prisoners have made it partway through the Step-Down Program several times, only to be returned to the SHU or general population based on a small, or fabricated, transgression.

23.     Unlike other ADX cells, the individual cells in the step-down units at ADX have no interior bars.  Accordingly, only one sliding solid steel door separates prisoners from the open day room at the center of the unit.  Joker Unit prisoners are part of a "Recreation Group" of up to seven other prisoners housed on the same tier.  Each Recreation Group is released at once into the day room or outside recreation yard, where they have unrestrained access to one another.

24.     For most ADX prisoners, being transferred into Joker Unit is a disorienting and dangerous experience.  After years of isolation, with no direct, unrestrained contact

127899313.6

with other  human beings, many prisoners experience a fundamental loss of even basic

social skills and  adaptive behaviors, and predictably find themselves paranoid about the

motives and intentions of  other prisoners, as well as staff members.  Once placed into

unrestrained contact with other,   similarly impaired and paranoid men, the stress on

prisoners -- even those with no mental illness -- can be extreme.  Assaults and

stabbings are common.

25.     The dangers of Joker Unit, and in particular the risk of physical

confrontation  because of a staff member's actions, are widely known to ADX prisoners,

increasing the stress  they experience upon entry into the Step-Down Program.  When

combined with the ravages of untreated or inadequately treated mental illness, those

stresses make it virtually impossible for  many prisoners with mental illness to earn their

way out of ADX by completing the Step-Down  Program.  Thus, even in the unlikely

event that a prisoner with mental illness -- despite  inadequate mental health care -- can

maintain clear conduct long enough to qualify for the Step-Down Program, very few can

hold themselves together long enough to complete that program.

26.     Instead, prisoners at ADX frequently succumb to the behavior caused by

their illness, are removed from step-down and transferred back to the SHU and then

"General Population," all the while being denied  the mental health care they need to

have any realistic chance to get better, succeed in conforming  their behavior to

institutional norms, and qualify for transfer to less secure prisons.  In part  because of

this cycle, the number of prisoners at ADX with mental illness, including serious  mental

illness, has risen steadily in recent years, and will continue doing so until the BOP

127899313.6

reforms the mental health care system at ADX and addresses the patent deficiencies in the ADX Step-Down Program.

27.     In all units at ADX, Defendant BOP makes a determined and calculated effort to dominate prisoners through the use of punitive techniques that include the use of extended periods of isolated confinement in the Control Unit or SHU and threats of other punitive measures such as the withholding of privileges (such as access to a television set, access to the in-house "commissary" where prisoners can purchase food and other items, access to the telephone, and prompt delivery of inbound mail). ADX programs are designed based upon a punishment philosophy rather than a control or rehabilitative philosophy. The behavior of prisoners with mental illness, in particular, deteriorates very rapidly when they are placed into programs designed to punish rather than to control or rehabilitate unacceptable behaviors.

28.     Consistent with ADX's punishment-focused correctional model, certain members of the correctional staff at ADX routinely use physical abuse of unruly or merely assertive prisoners to create fear and to demonstrate the dominance of the correctional staff. The harsh and rigid disciplinary philosophy employed at ADX is inappropriate for prisoners with serious mental illness, particularly those who not only have mental illness but whose minds also are dulled by confinement in sustained isolation. For example, certain prisoners are required to stand with their backs to the door and hands on the wall when their meals are delivered. If a prisoner fails to instantly comply, officers often depart without leaving a food tray. As a result, prisoners with psychosis or deep depression, including those whose conditions are exacerbated

127899313.6

by BOP's failure to provide required medications and other mental health care, frequently go without food on the ostensible basis that they defied an officer's order, when in fact the prisoner's only failing was a failure to understand the order or instantaneously clear his mind of fog induced by untreated mental illness and sustained isolation.

29.     As described below, Bacote has a history of serious mental illness. Due to his mental illness, the brutal disciplinary model employed by the staff at ADX is often an instrument of terror and abuse, deployed by staff members, many of whom lack the training and skills necessary to manage prisoners with mental illness safely and effectively, and some of whom provoke and aggravate the very conduct they punish.

**B.    Extended Confinement in Isolation Can and Often Does Have a Devastating Effect on Prisoners' Mental Health**

30.     As early as the 1960s, electroencephalography ("EEG") examinations demonstrated the slowing of brain waves of prisoners confined in isolation for longer than a week.

31.     A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions.

32.     Similarly, a 2011 study demonstrated that after only a week of solitary confinement, prisoners showed decreased EEG activity, indicative of increased stress, anxiety, and depression.

33.     The BOP has known since at least 1999 that extended periods of confinement in isolation can be psychologically damaging to any prisoner and can be

127899313.6

particularly harmful to  individuals with pre-existing mental illness.  Specifically, a 1999

study conducted under the  auspices of the DOJ and the National Institute of

Corrections concluded:

> Insofar as possible, mentally ill inmates should be excluded from extended
> control facilities.  Each inmate being considered for such a facility should
> have a mental health evaluation.  Although some mentally ill offenders are
> assaultive and require control measures, much of the regime common to
> extended   control   facilities   may   be   unnecessary,   and   even
> counterproductive, for this population.

34.     In May 2013, the  United States Government Accountability Office ("GAO")

issued a detailed report entitled  "Bureau Of Prisons: Improvements Needed in Bureau

of Prisons' Monitoring and Evaluation of  Impact of Segregated Housing."  That report

includes many troubling findings concerning the  BOP's operation of ADX, including one

making clear that the BOP's publication of policies does not even begin to address the

problems at which the policies are aimed, because the BOP  does not monitor

compliance with its policies at ADX:

> While BOP has a mechanism to centrally monitor many of its segregated
> housing unit  policies, BOP does not centrally monitor the policies specific
> to its most restrictive  segregated prison, the ADX facility.  As a result, BOP
> has  less  assurance  that  ADX  staff  consistently  follows  ADX-specific
> policies to the  same degree that these requirements are  followed for
> [Special Housing Units] and [Special Management Units].

35.     The GAO also found:

> While most BOP officials told us there was little or no clear evidence of
> mental  health  impacts  from  long-term  segregation,  BOP's  Psychology
> Services Manual explicitly  acknowledges the potential mental health risks
> of inmates placed in long-term  segregation.  Specifically, it states that
> BOP "recognizes that extended periods of  confinement in Administrative
> Detention or Disciplinary Segregation Status may have an  adverse effect
> on the overall mental status of some individuals."

36.    Following a June 2012 oversight hearing in the United States Senate during which the Director of the BOP admitted that the BOP has never evaluated the impact of solitary confinement on prisoners, the BOP commissioned an independent study on that issue. The study culminated with a 242-page report issued in December 2014. Among many other BOP failings, that report detailed, as follows, the mismanagement of mental illness in segregation units such as ADX:

(a)    A large number of prisoners in solitary confinement need mental health treatment, but are not receiving it;

(b)    No protocol exists to identify prisoners with mental illness who should be kept out of solitary confinement;

(c)    Inmates often receive a mental health diagnosis by medical students or interns who are not trained in psychiatry, and once diagnosed, they rarely receive follow-up reassessments or proper medication; and

(d)    No reentry programs or means of tracking for prisoners coming out of segregation exist.

37.    Despite the foregoing and mountains of anecdotal and empirical data confirming the impact on mental health of extended isolated confinement, the BOP still assigns to ADX prisoners who have mental illness, including serious mental illness, still fails to maintain an adequate program to diagnose and treat the mental illnesses created and exacerbated by the conditions of confinement there, and still fails to prepare prisoners with mental illness from release to society or to less restrictive housing units.

13

127899313.6

C.   **BOP Has a Documented History of Violating Its Own Written Policies Concerning Evaluating, Housing, and Treating Prisoners With Mental Illness at ADX**

38.   Even before the filing of the Cunningham Lawsuit, the BOP's own policies stated that prisoners with serious mental illnesses should not be assigned to ADX. Upon information and belief, those policies reflect the BOP's recognition that extended confinement in isolation and the institution's disciplinary practices pose substantial risks to prisoners' mental health, and can be particularly harmful for prisoners with serious mental illnesses.

39.   In light of the Cunningham Lawsuit, and upon information and belief, the BOP has taken some limited steps to address the rampant constitutional violations in mental health care at ADX. Those steps include:

(a)   Screening prisoners at ADX and identifying dozens of prisoners with a serious mental illness or a mental illness requiring treatment;

(b)   Enacting a revised policy for the care and treatment of prisoners with mental illness, which like the BOP's prior policies explicitly excludes from ADX prisoners diagnosed with a serious mental illness;

(c)   Enacting a policy of treatment "care levels," providing for treatment of prisoners diagnosed with a mental illness or serious mental illness;

(d)   Creating new secure facilities for treatment of prisoners with serious mental illness, and transferring some ADX prisoners with serious mental illness to those facilities;

(e)   Enacting a new suicide prevention policy at ADX; and

127899313.6

(f)     Revising certain policies at ADX that fundamentally interfered with delivery of mental health treatment, such as a policy previously interpreted by the BOP to prohibit the administration of psychotropic medications to prisoners housed in the ADX Control Unit.

40.     These enhanced policies and actions have been steps in the right direction but they have failed to resolve BOP's constitutional violations.  For example, the BOP has failed to follow its recently enacted mental health-related policies in regards to Bacote.  In particular, but not by way of limitation, having enacted a revised policy that (like prior policies) excludes prisoners with serious mental illness (like Bacote) from ADX, the BOP has manipulated diagnoses to avoid the exclusionary consequences of an initial, correct diagnosis, and otherwise undermined the implementation of and compliance with the very policies that the BOP enacted in response to the serious constitutional violations that originally precipitated the filing of the Cunningham Lawsuit.

41.     Bacote has been diagnosed by the BOP with serious mental illness and yet remains housed at ADX where he does not receive constitutionally adequate mental health care.

42.     The BOP's written procedures for transferring prisoners to ADX state that prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at … ADX."  BOP Program Statement 5100.08, "Prisoner Security  Designation and Custody Clarification," Chapter 7, p.18.  The BOP has widely ignored this  prohibition, both before and since this and related lawsuits were filed.  The

BOP regularly assigns prisoners to ADX even though they have well-documented histories of mental illness, and in many cases, histories showing that their mental illnesses can be controlled with proper treatment.

43.     BOP policies also have consistently required that all prisoners are given a psychiatric screening upon arrival at ADX. For example, the BOP's pre-lawsuit policies require prison staff to "ensure that assessment and treatment planning procedures exist to identify all prisoners entering the institution with either a recent history or current symptoms of significant mental illnesses and/or risk of suicide." BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," p.4. The May 1, 2014 Program Statement supplements these policies and provides for more explicit levels of screening for mental illness, including pre-designation screening, initial care level assignment, and psychology intake screening. During the facility intake screening, prisoners with any of the following must be referred immediately to the Mental Health Program Coordinator for a more thorough assessment:

- Recent history or current symptoms of significant mental illness;

- Signs or symptoms consistent with a possible mental disorder;

- Use of medication for treatment of a mental illness or disorder;

- Documented mental health designation;

- Risk of suicide.

Id.; BOP Program Statement 6340.04, "Psychiatric Services," § 9(a).

44.     Even when the BOP correctly identifies prisoners at ADX who have a mental illness, many are not given appropriate treatment, including either counseling or

127899313.6

medication.    Despite the BOP's updated policies concerning the development of treatment plans and delivery  of mental health services, the BOP is still regularly failing to develop meaningful treatment plans  even for prisoners who have chronic and obvious mental illness, and failing even to establish at  ADX a reliable mechanism for delivering elementary mental health services, such as timely  access to psychiatry services for prisoners who have been prescribed psychotropic medications,  timely access to crisis counseling, and counseling in both individual and group settings that is delivered in a consistent fashion and includes plans for continuity of care from one provider to  another when staffing changes occur.  As discussed below, Bacote does not receive appropriate, constitutionally adequate treatment and placement for his serious mental health needs.

45.    Because of the particularly severe conditions of confinement in the ADX Control  Unit, federal regulations require the BOP to adhere to an especially detailed set of mental health  standards, including:

The Warden may not refer an inmate for placement in a control unit

… [i]f the inmate shows evidence of significant mental disorder or  major physical disabilities as documented in a mental health  evaluation or a physical examination. 28 C.F.R. §541.41(c)(1).

*Mental health services.*  During the first 30-day period in a control  unit, staff shall schedule the control unit inmate for a psychological  evaluation conducted by a psychologist.  Additional individual  evaluations shall occur every 30 days.  The psychologist shall perform  and/or supervise needed psychological services.  Psychiatric services  will be provided when necessary.  *Inmates requiring prescribed  psychotropic medication are not ordinarily housed in a control unit.*

28 C.F.R. §541.46(i) (Emphasis added).

127899313.6

46.     The BOP is violating every major requirement of these regulations.  The BOP has justified this in Orwellian fashion: it discontinues a prisoner's medication, thereby making the now non-medicated prisoner "eligible" for placement in the Control Unit.  Then, when this newly "eligible" prisoner requested medication needed to treat his serious mental illness, he is told that BOP policy prohibits the administration of psychotropic medication to him so he should develop "coping skills" as a substitute for the medication being withheld.  Instructing a prisoner confined in long-term segregation and who has Bipolar Disorder to self-treat his disease with coping skills is like demanding that a diabetic prisoner learn to "cope" without insulin.  Likewise, the required 30-day "individual evaluations" are in actuality rarely performed on prisoners in the Control Unit.

47.     Both the former and as-revised BOP policies require that prisoners with mental illness be monitored on an ongoing basis to assess treatment compliance.  BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," at 5; May 1, 2014 Program Statement at 10-11.  Under the BOP's former policies, for certain prisoners, including those receiving psychotropic medication and those segregated for mental health reasons, mental health staff must, at a minimum, conduct a monthly interview to assess the prisoner's treatment strategy.  Program Statement 5310.13 at 5.  Under the BOP's revised May 1, 2014 Program Statement psychosocial interventions are required on an even more regular basis: monthly for prisoners designated CARE2-MH and weekly for prisoners designated CARE3-MH and CARE 4-MH.  Program Statement 5310.16 at 10-11. As with other applicable policies, ADX staff

127899313.6

routinely ignore this written monitoring requirement.  Some prisoners never leave their

cells or  speak with staff for months.  Some lived for extended periods in squalor, in

cells caked with their  own feces and bodily fluids, without bathing, and in some cases

without even getting out of bed.    Any meaningful "monitoring" would identify and trigger

intervention for such prisoners, but  rarely, if ever, does ADX staff seek to remedy the

fetid and unsafe living conditions of many of  the people in their custody who have

mental illness.

**D.    ADX Continues to House Prisoners With Serious Mental Illness Who Are Dangerous to Themselves and Others**

48.    Plaintiff Bacote has various forms of mental illness, including Bipolar

Disorder, Type I, Depressive Episode with mixed features and persecutory delusions; and

Major Depressive Disorder.  He has also been diagnosed with Mild Mental Retardation

(or a Neurodevelopmental Disorder of Mild Intellectual Disability), is functionally

illiterate, and suffers the long-term effects of a serious closed head injury.  These

mental conditions are described and defined more completely in the Diagnostic and

Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V").

49.    Prisoners with mental illness, including "serious" mental illnesses, are

sometimes  confined at ADX for months or years without adequate mental health

treatment, with predictably  devastating results.  These conditions exacerbate their

mental illness, making them increasingly  dangerous to themselves and others.  Their

inadequately treated illnesses—coupled with the extreme conditions of confinement at

ADX—often lead to aggressive and violent behavior which is in turn used by the

correctional staff as justification (if not pretext) for further acts of extreme isolation and

violence directed at the prisoner, thereby establishing a vicious cycle in which anger begets a violent response that begets more anger.

50.     During the relevant time period, Bacote has had chronic mental illness alongside functional illiteracy and the enduring and unpredictable effects of a serious closed-head injury.

51.     Prisoners with mental illness, including those with serious mental illnesses, also  are housed throughout ADX's General Population Units, and inhabit most of the 12 housing  ranges that comprise those units.  Such prisoners range from recluses who literally have not left  their cells in months or years, to more boisterous prisoners who bang on their cell bars, or their  showers, day and night, talk to themselves, wail and scream, and otherwise express their  indeterminate suffering to the great disruption and discomfort of other nearby prisoners.

52.     The BOP maintains separate facilities in other locations for housing and treating prisoners with mental illness, including severe mental illness, including the Medical Center for  Federal Prisoners in Springfield, Missouri ("MCFP Springfield"), the Federal Medical Center in  Butner, North Carolina ("FMC Butner"), the Federal Medical Center in Rochester, Minnesota   ("FMC Rochester"), the Federal Medical Center in Devens, Massachusetts ("FMC Devens"), the  High Security Mental Health Step-Down Unit at USP Atlanta, and the High Security STAGES Program at USP Florence.  MCFP Springfield is an administrative facility that provides medical,  mental health, and dental services to male offenders of all security levels, including prisoners  classified for confinement at ADX.  It now houses many former ADX prisoners transferred from  ADX

20

as a result of the Cunningham Lawsuit.  FMC Butner is an administrative facility that houses male  prisoners of all security levels, including prisoners classified for confinement at ADX.  FMC  Rochester and FMC Devens are administrative facilities providing specialized medical and   mental health services to male offenders.  The High Security Mental Health Step-Down Unit at  USP Atlanta and the High Security STAGES Program at USP Florence were created in specific  response to the Cunningham Lawsuit, for the purpose of housing prisoners with mental illness transferred from ADX due to the Cunningham Lawsuit.

53.     Plaintiff Bacote could be safely and securely housed at any of the facilities referred to in the  preceding paragraph for treatment of his mental illnesses.  In fact, a large  number of other ADX prisoners have been hospitalized at MCFP Springfield and/or FMC Butner  while designated for confinement at ADX.

**E.     Mental Health Care Treatment at ADX is  Constitutionally Inadequate**

54.     The Eighth Amendment to the United States Constitution guarantees to Bacote adequate medical care, including care for mental illness, and that his conditions of confinement will not be cruel and unusual.  That guarantee includes access to an adequate process for assessing the need for mental health care,  and access to necessary care itself.  The BOP falls woefully short of providing this constitutionally-guaranteed level of care.     It also fails to provide constitutionally-adequate mental health treatment to Bacote.  It denies that individuals it has diagnosed with other mental illnesses, and who under BOP's own policies must receive treatment, are entitled to treatment under the Constitution.  If the BOP chooses to assign or house at ADX

prisoners with mental illness, it must provide constitutionally adequate mental health screening and treatment, taking into account the isolated conditions of confinement and harsh disciplinary regime of ADX.

55.     To satisfy the requirements of the Eighth Amendment, an institutional mental health system in a facility such as ADX must provide care consistent with contemporary community standards and evolving standards of decency.

56.     The BOP does not provide adequate mental health staffing at ADX. Upon information and belief, when the Cunningham Lawsuit was first filed, only two mental health professionals -- both psychologists -- were responsible for the mental health of the approximately 420 prisoners housed at ADX, many of whom have chronic mental illnesses or other mental health issues, and many others of whom experience periodic acute mental health crises. As of June 2012, these health care professionals were assisted by a psychiatrist who spent only approximately one day per week at ADX, a period that was grossly inadequate given the substantial number of prisoners at ADX who require psychotropic medications.

57.     Since this action was filed and, upon information and belief, because the related Cunningham Lawsuit was filed, the BOP has increased from two to four the number of full time psychologists serving prisoners at ADX, and has also added to the ADX mental health staff a part-time psychiatric nurse and a psychology technician. However, upon information and belief, turnover among the psychologists is rampant, resulting in extended periods during which one or more of the four authorized positions

remain vacant.  This results in serious problems with continuity of care, which the BOP has done little if anything to address.

58.     The FCC Florence psychiatrist who served ADX prisoners as of June 2012 resigned in mid-2012, and has not been replaced.  Although a contract psychiatrist was on staff  for a few months in 2014 and various other psychiatrists have occasionally provided in-person  services at ADX in the past few years, since the summer of 2012 ADX prisoners have been  forced to rely primarily on "telepsychiatry" services provided by videoconference.  During their  habitually short (15 minutes) telepsychiatry sessions, prisoners often remain chained hand and  foot, and have at various relevant times been surrounded by corrections officers wielding batons.     Under such circumstances, few prisoners are able to communicate effectively with the  telepsychiatrist, and almost none receive effective psychiatry help.  Moreover, it frequently takes  months for prisoners to see a psychiatrist either in person or by telepsychiatry.

59.     Even though the BOP has taken some steps to address the gross mental health  staffing shortage that previously existed, the mental health staff remains grossly inadequate to serve the needs of Bacote who requires mental health services to address his chronic mental illness, acute mental health crises, and the damaging long-term impact that confinement in isolation has even on relatively healthy minds.  As a result of  inadequate staffing by mental health professionals, Bacote does not have timely access to mental health professionals, particularly in times of crisis.    This leads to Bacote becoming involved in escalating conflicts and violence that would be  avoided if adequate mental health staffing were provided at the facility.  The consequences of

inadequate mental health staffing include a risk of physical harm to Bacote, other prisoners, and a risk of harm to staff.

60.     The BOP provides psychotropic medication to some, but not all, of the prisoners with mental illness who are housed at ADX.  Furthermore, although the efficacy of many psychotropic drugs may be affected by the time of administration and by factors such as proximity of the administration to a meal, ADX staff distributes medications on an irregular schedule that is often inconsistent with the instructions for consumption of the medication.  Staff members responsible for distributing medications also frequently make mistakes by distributing the incorrect medication to prisoners, or incorrect dosages of the correct medication.  Other medications that are supposed to be taken with food are delivered when no food is available.  And the time of day when medications are available to prisoners varies significantly from day to day,  which causes problematic and sometimes dangerous fluctuations in prisoners' medication regimens.  In addition, medications formulated to be administered as a solid tablet are frequently delivered in crushed form, which negatively impacts their effectiveness and can cause other health problems.  The haphazard and sometimes reckless distribution of medications substantially interferes with the benefits the medications provide to those ADX prisoners lucky enough to be authorized to receive needed psychotropic medications.

61.     Many prisoners at ADX receive their psychotropic medication through a "pill line" procedure in which the medication is crushed and given to them at their cell door in a cup.   Many of the prisoners at ADX with serious mental illness (like Bacote)

24

are severely paranoid as a result of their illness, and generally believe that the staff providing medication is either providing the wrong medication or, in some cases, affirmatively attempting to poison them. In such circumstances, prisoners sometimes ask to receive whole pills that they can recognize (based on extended histories of taking the same medication), or for staff to show them the pills they are being given before grinding them up. Staff members routinely refuse these requests, leaving prisoners with serious mental illness (like Bacote) to choose between declining needed medication or consuming a substance they genuinely (even if erroneously) believe will harm or kill them. Bacote has asked to receive his medications in whole pill form. His requests have been denied.

62. ADX provides inadequate mental health counseling to prisoners like Bacote. At various relevant times, most of the "psychology programming" consists of distributing to prisoners books with such titles as "Anger Management for Dummies," "Choose Forgiveness - Your Journey to Freedom," and "Why Zebras Don't Get Ulcers." Staff award certificates to prisoners diligent and literate enough to self-treat their serious mental illnesses by completing elementary workbooks. Bacote, who is functionally illiterate, has no meaningful access to the negligible therapeutic information distributed by ADX in written form.

63. Some repetitive and elementary psychology programming is also available to the segment of the ADX prisoner population with access to a television. The information provided in this manner is of little if any use to many prisoners with mental illness or psychosis. Moreover, many of ADX's prisoners with the most chronic and

devastating mental illnesses have been  housed for months or years in the SHU, where many prisoners are denied access to all television  programming, including even the meager televised mental health programming provided to other  prisoners.

64.    Members of ADX mental health staff occasionally talk to prisoners.  At various  relevant times, those occasional "counseling" sessions almost invariably have been conducted through the bars of the prisoner's cell, in the immediate presence of a correctional officer and within earshot of other prisoners housed on the same range. That process turned psychological  counseling into a farce.  Few people, in or out of prison, are comfortable discussing intensely  personal matters in a highly public environment that renders them subject to ridicule, discrimination, or even violence.  The same is true for Bacote, who at times has been forced by ADX's approach to mental health "counseling" to choose between forgoing that needed counseling or exposing himself to violent assault or threats based on events or concerns discussed with a mental health professional within easy earshot of other prisoners.  Bacote often refuses counseling for just this very reason.

65.    Since the filing of the Cunningham Lawsuit, the BOP has established a private space in most if not all of ADX's housing units that is suitable for safe, secure, and  private psychology counseling sessions.  However, because of the large population at ADX with  serious mental illness and the small number of staff members and counseling facilities, "talk  therapy" at ADX remains grossly inadequate.

66.    Suicide and mental health crisis services at ADX also are systematically deficient.   Prisoners with mental illness who threaten suicide have often been goaded

127899313.6

by ADX staff members to kill themselves.  Prisoners who take steps to slash their wrists or hang themselves  generally receive only minimal medical treatment for acute injuries. And instead of receiving  mental health intervention, they are punished: they receive a disciplinary incident report that  sometimes results in a trip to the SHU and loss of privileges.

67.     Upon information and belief, the BOP provides only grossly inadequate training to the staff at ADX, including in particular the corrections staff,  regarding mental illnesses and the safe and humane management of prisoners with mental illness.     As a result, staff members routinely resort to unnecessary violence and disciplinary  actions when an inadequately treated prisoner with mental illness acts out.  Thus, prisoners who  have mental illness, including those in the throes of a psychotic episode, frequently are subjected to barbaric treatment more suited to the dungeons of medieval Europe than to a modern American prison.  For example, prisoners with mental illness are routinely "four  pointed" -- chained by the wrists and ankles in either a prone or supine position on top of a  concrete platform -- often for extended periods.  While chained, prisoners with mental illness are sometimes left to urinate and defecate on themselves, and sometimes are denied basic nutrition.

68.     As a result of this type of abuse, other prisoners in nearby cells and ranges have  been subject to the shrieking and suffering of prisoners undergoing such abuse.  Upon  information and belief, such abuses were caused and/or exacerbated by inadequate staff  treatment and a general failure of supervision.

69.     Upon information and belief, the BOP requires or encourages members of the  mental health staff at ADX to perform correctional functions.  In fact, BOP policy requires  psychologists to serve as corrections officers first, and only secondarily as healthcare providers.     In this respect psychologists are distinguished in a critical way from chaplains and physicians,  who are exempt under BOP policy from performing correctional functions.  As a result of this  BOP policy, and upon information and belief, at various relevant times ADX psychologists have:  performed prisoner escort duty within the prison while armed with weapons, openly brandishing  those weapons in the presence of prisoners; worked shifts in the prison's gun towers; appeared at  the doorways of prisoners brandishing clubs in an aggressive fashion; and participated in violent  acts toward prisoners, including on at least one instance, participating in a violent cell extraction.     The performance of correctional functions by mental health professionals in the presence of or  with the knowledge of prisoners blurs the line between the mental health profession and the  correctional profession, and destroys whatever trust might otherwise develop among prisoners  and the mental health professionals who are the only source of treatment for their mental  illnesses.  In the absence of some measure of trust, no mental health clinician can effectively treat  a prisoner's mental illness.

70.     Bacote's ongoing housing at ADX is causing substantial harm to Bacote as his serious mental illnesses are not being properly acknowledged and treated.  The minimum mental health treatment he receives is inadequate for his serious needs.

71.     As described above, Defendant BOP's failure to diagnose and treat serious mental illness has devastating consequences for Bacote.  With disregard for the requirements of the Eighth Amendment, Defendant BOP has repeatedly violated Bacote's constitutional rights.

**F.      Defendant BOP Has Displayed Sustained Deliberate Indifference to the Plight and Needs  of Prisoners With Mental Illness at ADX**

72.     Defendant BOP is, and has been for years, on actual notice of the unmet mental health  needs at ADX, but has demonstrated sustained and deliberate indifference to those needs.     Defendant BOP's actual knowledge of the unmet mental health needs of ADX prisoners has come from a variety of sources, including without limitation medical records of Bacote and other mentally ill prisoners, direct observation of prisoners with obvious mental illness like Bacote, administrative remedy requests filed by Bacote and other prisoners, past litigation challenging the ADX mental health system, current related litigation challenging the ADX mental health system, and suicides of prisoners with mental illness.

73.     As illustrated by facts set forth in this Fourth Amended Complaint, and others to  be proven at trial, Defendant BOP has long been aware of the systematic failures in the ADX mental  health system.  Prior to this lawsuit and the related Cunningham Lawsuit, the BOP has done little or nothing to correct those failures. Defendant has shown deliberate indifference to the needs of ADX prisoners who have serious mental illnesses.

## VI.   PLAINTIFF'S MENTAL-HEALTH ALLEGATIONS

74.     Michael Bacote ("Bacote," pronounced "Bay-coat") is 41 years old, and grew up in Washington, D.C.  He is currently serving a 28-year sentence, with a scheduled release date of September 7, 2034.

75.     Bacote has been incarcerated at ADX since 2009.

76.     Bacote suffers from various serious mental illnesses, including Bipolar Disorder, Type I, Depressive Episode with mixed features and persecutory delusions; and Major Depressive Disorder.  He has also been diagnosed with Mild Mental Retardation (or a Neurodevelopmental Disorder of Mild Intellectual Disability), is functionally illiterate, and suffers the long-term effects of premature birth and serious closed head injuries.

77.     Bacote was born premature and has suffered serious mental disabilities throughout his life.  While in primary school, he repeated kindergarten and the first grade twice, and repeated the second grade three times.  Tests conducted while Bacote was in the second grade found his reading levels to be at a pre-kindergarten level.  At age twelve, he was still in the fourth grade.  Bacote stopped going to school when he was thirteen.

78.     Psychiatric and mental tests performed on Bacote as a teenager confirmed that he is illiterate, and he tested far below his age group in every tested subject.  As a twelve year old, Bacote scored a language age equivalent of 7 years, 3 months on the Utah Tested Language Development exam.  In the Wide Range

127899313.6

Achievement Test - Revised (WRAT-R), also at age twelve, he scored in the first percentile in spelling, the 0.1 percentile in reading, and the 0.04 percentile in arithmetic.

79.    Bacote was prescribed medication for psychiatric problems at an early age, including the antipsychotic Mellaril.  He began taking Adderall for attention deficit disorder at age twelve.

80.    Bacote has been incarcerated much of his adult life.  Throughout his incarceration, the BOP has consistently diagnosed Bacote with Bipolar Disorder. Bacote has been prescribed medication to treat this serious, recurring mental illness.

81.    In 2003 or thereafter, Bacote was diagnosed by BOP psychiatrists as having recurrent Major Depressive Disorder.  He was prescribed medication to treat this serious, recurring mental illness.

82.    Throughout his incarceration, Bacote has also been observed by BOP psychiatrists as displaying Severe Paranoid Ideation.  And, while a prisoner at USP Beaumont, Bacote was prescribed the antipsychotic Risperdal to treat his paranoid behavior.  He has been prescribed Rispersal by BOP psychiatrists at ADX as well.  At ADX, Bacote has again displayed Severe Paranoid Ideation.  For example, Bacote has alleged on numerous occasions that there is a BOP staff conspiracy to kill him.

83.    For example, while housed at USP Beaumont, Bacote repeatedly alleged that the staff was planning to hang him in recreation cell #6, claiming that he had already informed his family and attorney of his impending murder, and advising his BOP psychiatrist to skip their next scheduled session so that the psychiatrist would not "get caught up" in the legal troubles surrounding Bacote's murder.

84.     Also while housed at USP Beaumont, psychologist Dr. Ray Coxe conducted an evaluation of Bacote's mental functioning.  Dr. Coxe's tests found that Bacote had a Full Scale IQ in the mildly impaired range of sixty-one, and Verbal and Performance IQs in the first percentile.  Bacote tested at the second grade level for reading and spelling, and at the third grade level for arithmetic.  Based on these results, his personal interaction with Bacote, and prior examination results from earlier in Bacote's life, Dr. Coxe diagnosed Bacote as suffering from mild mental retardation.

85.     Throughout his incarceration, including since his transfer to ADX in 2009, BOP psychiatrists have prescribed, and Bacote has received, psychotropic medications like Risperdal to treat his serious mental illnesses.

86.     Bacote has a history of suicide ideation and suicide attempts.  He has attempted suicide while housed at ADX.

87.     In 2015, an independent psychiatrist who had evaluated Bacote multiple times from May 2012 through November 2014, and reviewed his medical and mental health records, concluded that Bacote suffers from Bipolar Disorder, Type I, Depressive Episode with mixed features and persecutory delusions and a Neurodevelopmental Disorder, Mild Intellectual Disability.  She also noted he suffers from, among other things, the long term effects of premature birth and multiple closed head injuries.

88.     In arriving at this diagnosis, and in addition to the numerous clinical evaluations spanning a three-year period, the psychiatrist reviewed Bacote's Bureau Electronic Medical Records from 1998 through 2014 and reviewed additional medical

records and psychometric tests.  The psychiatrist's diagnostic conclusions are consistent with the earlier BOP diagnoses noted in his records.

89.     Defendant BOP is aware that Bacote suffers from, among other things, Bipolar Disorder, Major Depressive Disorder, and Severe Paranoid Ideation.  As mentioned above and observed by the independent psychiatrist, Bacote received these diagnoses from BOP psychiatrists and medical personnel.  Defendant BOP is also aware that Bacote suffers from mild mental retardation.  Further, BOP psychiatrists have observed Bacote to become increasingly paranoid and delusional.

90.     The myriad of previous diagnoses and recent independent diagnosis notwithstanding, even a layperson could recognize Bacote's obvious need for mental health treatment.

91.     In recent years, BOP medical and mental health staff at ADX have failed to properly acknowledge the serious mental illnesses identified above.  Indeed, these are the same mental illnesses that other BOP doctors have consistently diagnosed throughout the entirety of Bacote's imprisonment up until his transfer to ADX.

92.     Bacote's serious mental illnesses have not resolved nor improved since his transfer to ADX.  Bacote's serious mental illnesses have in fact only been exacerbated by the conditions that exist at ADX and Defendant BOP's failure to adequately provide mental health care.  However, Defendant BOP has consistently refused Bacote's repeated requests for mental health assistance in recent years:

- In late 2009, Bacote requested treatment for his mental illness and mental retardation and to be transferred from ADX.  That request was denied.

- Again, sometime in 2011, Bacote requested treatment for his mental retardation, and transfer to another facility.  Those requests were denied.

- Since 2009, and continuing to this day, Bacote has repeatedly requested transfers to a facility better equipped to house and treat prisoners with serious mental illnesses.  Each request has been denied.

- Additionally, Bacote has filed numerous Cop-Outs to ADX prison officials, requesting treatment for his mental illness and mental retardation.  All of these requests were denied.[2]

93.     Prior to his transfer to ADX, BOP physicians prescribed psychotropic medication for Bacote's serious mental illness.  Bacote wants and needs that medication.

94.     Despite his history and documented diagnoses of serious mental illnesses like Bipolar Disorder, the BOP is refusing to properly treat Bacote's mental illnesses. Among other things, the BOP is currently refusing to prescribe Bacote needed psychotropic medications like Risperdal, which he successfully received at earlier times in his incarceration and which remain medically necessary.

95.     Bacote has documented recurrent and severe episodes of Major Depression for which he has been prescribed antidepressants but not mood stabilizing medication.  Due Bacote's Bipolar Disorder, prescribing him antidepressants without mood stabilizing medication can induce "rapid cycling" (that is, more frequent episodes of mood cycling) and also, over time, can lead to "mixed" symptoms, meaning a hybrid of manic and depressive symptoms that are even more difficult to treat.

---

[2] Although Bacote is functionally illiterate, he managed to complete this paperwork with the assistance of other prisoners.

96.    The BOP currently insists that Bacote receive the limited antidepressant medication he does receive crushed up in a cup.  Due to his severe paranoid, Bacote is extremely fearful that the BOP staff responsible for delivering his medication will intentionally or accidentally give him the incorrect medication.  Bacote has repeatedly asked to receive his medication, which he recognizes, in solid pill form, or, alternatively, that he be allowed to see the medication in whole pill form before it is crushed.  The BOP has refused both requests.  As a result, Bacote has been forced to choose between foregoing needed medication or consuming an unknown crushed substance he genuinely (rightly or wrongly) believes will make him sick or kill him.

97.    Thus, even the minimal treatment Bacote has received is grossly inadequate.  An independent psychiatrist noted the significant harmful effect the discontinuation of Bacote's psychotropic medication had on Bacote's mental state and wellbeing.

98.    Bacote is struggling to cope with his severe depression, paranoia, and Bipolar Disorder without proper treatment and is effectively receiving no medication for his serious mental illnesses.

99.    Bacote does not currently receive adequate mental health treatment, nor has he received at present a proper mental health diagnosis.

100.    For years Defendant BOP has been on actual notice of Bacote's unmet mental health  needs at ADX, but has demonstrated sustained and deliberate indifference to those needs.    Defendant BOP's actual knowledge of the Bacote's unmet mental health needs has come from a variety of sources, including, without

limitation, Bacote's medical and mental health records, direct observation of Bacote, administrative remedy requests filed by Bacote, and suicide attempts by Bacote.  All these indicators notwithstanding, a layperson could recognize Bacote's need for mental health treatment.

101.    Defendant BOP's regulations forbid housing prisoners with serious mental illnesses—like Bacote—at ADX.  Defendant BOP thus violates its own regulations by housing Bacote at ADX.

102.    Bacote has exhausted all required conditions precedent to the commencement of this lawsuit, including his available administrative remedies pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

## VII.    RETALIATION ALLEGATIONS

103.    Based on allegations similar to the mental health allegations raised above, Bacote served as the lead-Plaintiff in a class action lawsuit defined above as the Cunningham Lawsuit.  *See Cunningham v. BOP*, 1:12-cv-01570-RPM-MEH.  The Cunningham Lawsuit was originally known as *Bacote, et al. v. Federal Bureau of Prisons, et al.*  Through the Cunningham Lawsuit, Bacote sought declaratory and injunctive relief regarding Defendant BOP's compliance with its own existing policies regarding the placement and treatment of mentally ill prisoners at ADX and with the requirements of the Eighth Amendment regarding mental health care for all prisoners who have been committed to Defendant BOP's custody at that facility.

104.    The Cunningham Lawsuit has the potential to disrupt BOP's operations at ADX.  For example, the Cunningham Lawsuit could force Defendant BOP to change how it screens and treats mental health issues.

105.    In addition to potentially requiring onerous, disruptive changes to ADX's system, the Cunningham Lawsuit resulted in negative media attention concerning the employees, including the correctional officers, employed at ADX.

106.    After Bacote was named as the lead-Plaintiff in the Cunningham Lawsuit, Defendants Sandusky and Balsik—correctional officers at ADX—began withholding Bacote's food.

107.    Defendants Sandusky and Balsik severely restricted Bacote's food rations and intentionally deprived Bacote of meals as a direct consequence of Bacote joining the Lawsuit.  In depriving Bacote of adequate nutrition, Defendants Sandusky and Balsik were substantially motivated by Bacote's participation in the Cunningham Lawsuit.

108.    Defendants Sandusky and Balsik told Bacote that his food deprivation was a consequence of Bacote's participation in the Cunningham Lawsuit.  The correctional officers encouraged Bacote to withdraw from the Cunningham Lawsuit.  They additionally used Bacote's inadequate nutrition, mental health issues, and placement in solitary confinement as tools to manipulate Bacote.

109.    As a result of Bacote's substantial deprivation of adequate food, Bacote experienced stomach pain, headaches, dizziness, confusion, and exhaustion.  Bacote's deprivation exacerbated his serious mental illness and he lost weight.

127899313.6

110.     After approximately one month to forty days of receiving inadequate nutrition, Bacote withdrew from the Cunningham Lawsuit.

111.     After he withdrew from the Cunningham Lawsuit, Bacote began to receive adequate nutrition.  Bacote's symptoms abated once he withdrew from the Cunningham Lawsuit and Bacote gained back the weight he had lost.

112.     Bacote has exhausted all required conditions precedent to the commencement of this lawsuit, including his available administrative remedies pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Eighth Amendment to the United States Constitution—
### Failure to Diagnose against Defendant BOP

113.     Bacote incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

114.     Defendant BOP's policies and practices subject Bacote to a substantial risk of serious harm and injury by failing to establish and maintain a program or practices to adequately screen and diagnose his serious mental illnesses.  Defendant BOP has been deliberately indifferent to this substantial risk of serious harm to Bacote.

115.     Defendant BOP has been and is aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct, and to Bacote's serious medical needs.

116.     Defendant BOP's policies and practices are the proximate cause of the deprivation of Bacote's rights under the Eighth Amendment.

38

**SECOND CLAIM FOR RELIEF**
**Violation of the Eighth Amendment to the United States Constitution—**
**Failure to Treat against Defendant BOP**

117.   Bacote incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

118.   Defendant BOP itself has acknowledged that prisoners with serious mental illnesses should not be housed at ADX because ADX is incapable of addressing the mental health needs of such prisoners.

119.   Bacote has serious mental illnesses that cannot be, and are not being, properly treated at ADX.

120.   The extreme conditions of confinement at ADX, including long periods of isolation, sensory deprivation, and inadequate and erratic mental health treatment and counseling, exacerbates the suffering and symptoms of Bacote's serious mental illness.

121.   As described herein, by its policies and practices, Defendant BOP subjects Bacote to a substantial risk of serious harm and injury by failing to establish and maintain a program to provide Bacote with adequate mental health treatment.

122.   Defendant BOP has been and is aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct, and continues to exhibit deliberate indifference to Bacote's serious medical needs.

123.   Despite being aware that Defendant BOP's continued housing of Bacote at ADX subjects Bacote to a substantial risk of serious harm and injury, Defendant BOP has consistently refused to transfer Bacote to an institution that can adequately -- and constitutionally -- address Bacote's mental illnesses.

127899313.6

124.    Defendant BOP's policies and practices, including the ongoing detention of Bacote at ADX—a facility at which prisoners like Bacote with serious mental illnesses should not be housed—proximately causes ongoing deprivation of Bacote's rights under the Eighth Amendment.

**THIRD CLAIM FOR RELIEF**
**Violation of the First Amendment to the United States Constitution—**
**Retaliation for a Protected Activity Against Defendants Sandusky and Balsik**

125.    Bacote incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

126.    As described herein, Bacote was engaged in constitutionally protected activity.  Specifically, Bacote was a plaintiff in the Cunningham Lawsuit, which seeks relief for BOP's failure to provide adequate mental health treatment to prisoners.

127.    As a direct consequence of Bacote's protected conduct, Defendants Sandusky and Balsik subjected Bacote to substantial risk of serious harm and injury by failing to provide him adequate nutrition over a prolonged period of time.  In doing so, Defendants Sandusky and Balsik were substantially motivated by Bacote's participation in the Cunningham Lawsuit.

128.    Bacote's entitlement to adequate nutrition is clearly established under Tenth Circuit and United States Supreme Court precedent.

129.    Defendants Sandusky and Balsik were personally involved in violating Bacote's clearly established right to access the courts.

130.    But for Bacote's participation in the Cunningham Lawsuit, Defendants Sandusky and Balsik would not have deprived Bacote of adequate nutrition.

40

131.    Bacote suffered serious mental, emotional, and physical harm as a result Sandusky's and Balsik's deliberate indifference.

132.    Defendants Sandusky and Balsik's actions, and the resulting injury to Bacote, were sufficient to chill a person of ordinary firmness from continuing to engage in the constitutionally protected activity.  As a result of Defendants Sandusky and Balsik's actions Bacote dropped out of the Cunningham Lawsuit.

## IX.    PRAYER FOR RELIEF

1.    Enter an Order transferring Bacote to a prison facility equipped to address Bacote's serious mental illness.

2.    Enter an injunction directing that Defendant BOP implement a program of mental health screening and diagnosis for the benefit of Bacote.  This program shall include the staffing of mental health professionals to provide the screening and diagnosis services required hereby.  The program shall provide, at a minimum, the following:

a.    A mental health examination for Bacote to determine the presence or absence of serious mental illness.

b.    An annual mental health examination, and regular mental health rounds by a mental health professional, to facilitate early detection and treatment of Bacote's  serious mental illness.

c.    A procedure for Bacote to establish a diagnosis by a mental health provider independent of the BOP.

3.      Enter an injunction directing that Defendant BOP implement a program of treatment for Bacote's serious mental illness as follows:

        a.      Staffing of mental health professionals to administer the program of mental health treatment;

        b.      Bi-weekly access to out-of-cell private psychotherapy;

        c.      Monthly access to confidential psychiatry sessions;

        d.      Access to at least 5-10 hours per week of out-of-cell therapeutic activity;

        e.      Access to at least 10 hours per week of out-of-cell recreational activity that allows for socialization with other prisoners;

        f.      Regular and scheduled receipt of all prescribed medication;

        g.      Not housing Bacote in any unit in which medications are not provided; and

        h.      Treatment planning team meetings three times annually.

4.      Award Bacote monetary damages against Defendants Sandusky and Balsik.

5.      Grant an award of attorneys' fees.

6.      Grant such other relief as this Court deems just and proper.

Respectfully submitted this 16th day of October 16, 2015.

s/ Jess Dance
Jess A. Dance
Benjamin J.H. Delanghe
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202
Telephone:  (303) 291-2300
Facsimile:  (303) 291-2400
Email:   JDance@perkinscoie.com
Email:   BDelanghe@perkinscoie.com

Attorneys for Plaintiff Michael Bacote, Jr.

Address of Plaintiff, Michael Bacote:

United States Penitentiary Administrative Maximum—ADX
P.O. Box 8500
Florence, CO 81226

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Marcy E. Cook
Assistant United States Attorney
U.S. Attorney's Office – Denver
1225 17th Street, Suite 700
Denver, CO 80202
marcy.cook@usdoj.gov

_s/ Jess Dance_
Jess A. Dance
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202
Telephone:  (303) 291-2300
Facsimile:  (303) 291-2400
Email:       JDance@perkinscoie.com

_Attorney for Plaintiff Michael Bacote, Jr._

127899313.6